*Marybeth Davis Meek v. Thomas Warren Linton, et al.*, No. 682, September Term, 2019. Opinion by Woodward, J.

I.  **ADULT GUARDIANSHIP – GUARDIANSHIP OF THE PERSON – NO LESS RESTRICTIVE FORM OF INTERVENTION – WELFARE AND SAFETY OF THE ALLEGED DISABLED PERSON**

II.  **ADULT GUARDIANSHIP – APPOINTMENT OF GUARDIAN OF THE PERSON – "GOOD CAUSE" TO PASS OVER PERSON WITH HIGHER PRIORITY UNDER ESTATES & TRUSTS ARTICLE ("E.T.") § 13-707 – DEFINITION OF "GOOD CAUSE" UNDER E.T. § 13-707(c)(1)(ii)**

III.  **ADULT GUARDIANSHIP – APPOINTMENT OF GUARDIAN OF THE PROPERTY – "GOOD CAUSE" TO PASS OVER PERSON WITH HIGHER PRIORITY AND APPOINT PERSON WITH LOWER PRIORITY UNDER E.T. § 13-207 – DEFINITION OF "GOOD CAUSE" UNDER E.T. § 13-207(c)(2)**

In 2008 Lois Hansen executed a Durable Power of Attorney and an Advance Health Care Directive, naming her daughter, Marybeth Meek, as attorney-in-fact and Health Care Agent. At that time both Mrs. Hansen and Meek lived in California. Also, around that time Mrs. Hansen reconnected with her childhood sweetheart, Adrien Hansen, who lived in Cambridge, Maryland. Mrs. Hansen moved to Cambridge to be with Mr. Hansen, and they were married in 2010. Several years later, Mrs. Hansen was diagnosed with dementia and in 2017 her mental state declined considerably. In March of 2017, Meek and Thomas Linton, Mrs. Hansen's eldest son, discovered that the home in which Mr. and Mrs. Hansen were living was in terrible condition. By the end of 2018, however, the home was in much better condition, and a team of professional health care providers, along with family members, had been assembled to provide care for Mrs. Hansen in her home.

Notwithstanding the condition of Mrs. Hansen's home and the care that she was receiving there, Meek attempted to exercise her authority as attorney-in-fact and Health Care Agent to move Mrs. Hansen from her home to a long-term care facility. Linton then filed a petition for guardianship of the person and property. After a two-day trial, the circuit court issued a lengthy, thorough, and well-reasoned oral opinion. Among other things, the court ruled that (1) there was no less restrictive form of intervention available, other than guardianship, that was consistent with Mrs. Hansen's welfare and safety; (2) there was "good cause" to pass over Meek's higher priority under E.T. § 13-707(a) and appoint Linton, a person with lower priority under that section, as guardian of Mrs. Hansen's person; and (3) there was "good cause" to pass over Meek's higher priority under E.T. § 13-207(a) and appoint Barrett King, Esq., a neutral third party and a person with lower priority under that section, as guardian of Mrs. Hansen's property. Meek noted a timely appeal.

**Held**: Affirmed.

I.   On appeal, Meek argued that a guardianship was not warranted under E.T. § 13-705(b), because she was willing and capable of acting as Mrs. Hansen's attorney-in-fact and Health Care Agent, and thus a less restrictive form of intervention was available. The Court of Special Appeals rejected Meek's argument, pointing to the language of E.T. § 13-705(b)(2) that a less restrictive form of intervention must be available and "consistent with the person's welfare and safety." The Court held that the trial court did not err when it found that allowing Meek to act as Mrs. Hansen's Health Care Agent was not a less restrictive form of intervention that was consistent with Mrs. Hansen's welfare and safety. *See* E.T. § 13-705(b)(2).

II.  Meek argued that the trial court erred by finding "good cause" to pass over Meek's statutory priority under E.T. § 13-707(a) and appoint Linton, a person with lower priority, as the guardian of Mrs. Hansen's person. The Court of Special Appeals disagreed. The Court stated that the trial court must find "good cause" under E.T. § 13-707(c)(1)(ii) in order to pass over a person with higher priority and appoint a person with lower priority. Because there was no definition of "good cause," the Court considered the statutory purpose and relevant case law and concluded that "good cause" under E.T. § 13-707(c)(1)(ii) means a substantial reason to find that a person with lower priority under E.T. § 13-707(a) is a better choice than a person with higher priority to act in the best interest of the ward.

After a review of the record, the Court concluded that the trial court's reasons and underlying factual findings were based on competent evidence and that the reasons supported the conclusion that Linton was the better choice to act in the best interest of Mrs. Hansen. Because those reasons, when taken as a whole, could be classified as substantial, the Court held that the trial court did not abuse its discretion by determining that "good cause" existed to pass over Meek's statutory priority and appoint Linton as guardian of Mrs. Hansen's person.

III. Meek argued that the trial court erred by finding "good cause" to pass over Meek's statutory priority under E.T. § 13-207(a) and appoint King, a neutral third party and a person with lower priority, as the guardian of Mrs. Hansen's property. The Court of Special Appeals again disagreed. The Court stated that the trial court must find "good cause" under E.T. § 13-207(c)(2) in order to pass over a person with higher priority and appoint a person with lower priority. Because there was no definition of "good cause," the Court considered the statutory purpose and relevant case law and concluded that "good cause" has the same meaning under E.T. § 13-707(c)(1)(ii) and E.T. § 13-207(c)(2).

After a review of the record, the Court concluded that the trial court's reasons and underlying factual findings were based upon competent evidence and that the reasons

supported the conclusion that King was the better choice to act in the best interest of Mrs. Hansen regarding her property.  Because those reasons, when taken as a whole, could be classified as substantial, the Court held that the trial court did not abuse its discretion by determining that "good cause" existed to pass over Meek's statutory priority and appoint King, a neutral third party, as guardian of Mrs. Hansen's property.

Circuit Court for Dorchester County
Case No. C-09-FM-19-000030

MARYBETH DAVIS MEEK

v.

THOMAS WARREN LINTON, ET AL.
_____

Berger,
Friedman,
Woodward, Patrick L.
          (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Woodward, J.
_____

Filed: April 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This appeal involves a petition for guardianship of the person and property of Lois A. Hansen, appellee, that was filed by her son, Thomas W. Linton, appellee, in the Circuit Court for Dorchester County on January 23, 2019. In an order dated June 3, 2019, the circuit court decided, among other things, that (1) Mrs. Hansen was in need of a guardian of the person and property; (2) no less restrictive form of intervention was available that was consistent with Mrs. Hansen's welfare and safety; and (3) notwithstanding the higher priority of Mrs. Hansen's daughter, Marybeth Meek, appellant, under Maryland Code, Estates and Trusts ("E.T.") §§ 13-707(a) & 13-207(a), there was "good cause" to pass over Meek and appoint persons with lower priority as guardians of Mrs. Hansen's person and property. As a result, in the same order, the court appointed Linton as guardian of Mrs. Hansen's person and a neutral third-party attorney, Barrett R. King, Esq., as guardian of Mrs. Hansen's property.

On appeal, Meek presents two questions for our review,[1] which we have expanded and rephrased as:

> 1. Did the trial court err in finding that there was no less restrictive form of intervention available that was consistent with Mrs. Hansen's welfare and safety?

[1] Meek posed the questions presented as:

> A. Did the trial court err in determining guardianship was necessary and was the least restrictive form of relief available when Mrs. Hansen had appointed Meek as her attorney in fact, health care agent, and trustee of her trust?

> B. Did the trial court err in passing over Meek for appointment as guardian of the person and property of Mrs. Hansen where the basis of doing so was disagreement among family members as to the residency and location of health care for Mrs. Hansen?

2. Did the trial court abuse its discretion in determining that "good cause" existed to pass over Meek's higher priority under E.T. § 13-707 and appoint Linton as guardian of Mrs. Hansen's person?

3. Did the trial court abuse its discretion in determining that "good cause" existed to pass over Meek's higher priority under E.T. § 13-207 and appoint a neutral third party as guardian of Mrs. Hansen's property?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## BACKGROUND

### I. Family Background

Lois Hansen is an 82-year-old resident of Cambridge, Maryland. Mrs. Hansen met Adrien Hansen when they were young and were "high school sweethearts," but they "parted ways after their high school days, separated by fate, circumstances[,] and time." In her early adulthood, Mrs. Hansen moved from Cambridge, Maryland, to Virginia, and then to San Diego, California. Mr. Hansen joined the Air Force in his early adulthood, and then started two seafood businesses, one in Southern Maryland and the other on the Eastern Shore of Maryland. Both Mr. and Mrs. Hansen had several other marriages, and Mrs. Hansen is the mother of three adult children from two relationships: Linton, Patrick Ferguson, and Meek. Meek and Ferguson are siblings; Linton is their half-brother.

In 2008, Mr. and Mrs. Hansen reconnected. On June 12, 2008, while Mrs. Hansen was still living in California, she executed a Durable Power of Attorney ("Durable POA") and an Advance Health Care Directive ("the 2008 documents"). Mrs. Hansen named Meek as her attorney-in-fact ("AIF") in the Durable POA and as Health Care Agent in the Advance Health Care Directive. Additionally, Mrs. Hansen appointed Meek to serve as trustee of a trust titled in Mrs. Hansen's name. Mrs. Hansen designated her close friend,

2

Margaret Calder, to serve as the back-up in both the Durable POA and in the Health Care Directive, in the case that "Meek was not willing, able[,] or reasonably available to serve in the capacity contemplated." At some point in 2008, Mrs. Hansen moved back to Cambridge, Maryland to be with Mr. Hansen.

On June 4, 2010, Mr. and Mrs. Hansen were married. Mr. and Mrs. Hansen "lived together as husband and wife happily and without interruption" in their home on Cassons Neck Road in Cambridge, Maryland. The couple's relationship was described as "close," and they were seen "cuddling in their home and out and around Dorchester County[.]"

*A.     Thomas Warren Linton*

Linton is Mrs. Hansen's eldest child. Mrs. Hansen gave birth to Linton when she was seventeen years old, and Mrs. Hansen and Linton's father divorced when Linton was two years old. Linton was raised by his father in Cambridge, Maryland, and lived there until he left home when he was eighteen years old to serve in the Marines. During Linton's adult life, "circumstances allowed for a closer relationship" between Linton and Mrs. Hansen. Specifically, Linton "came to understand that his mother was young and overwhelmed at [seventeen] years old when [Linton] was born." While he was living in California in his thirties, Linton would have Sunday brunch with Mrs. Hansen, and while in his forties, Linton visited his mother frequently on the weekends. After Mrs. Hansen returned to Cambridge in 2008, Linton attended a family reunion at the Cassons Neck property that same year. Linton would speak to Mrs. Hansen on the phone once every three to four weeks. In 2010, Linton attended Mr. and Mrs. Hansen's wedding, where he "stood

3

up or vouched for the legitimacy of [Mr. and Mrs. Hansen's] relationship during the marriage ceremony." Linton currently resides in New Bern, North Carolina.

### B.    Marybeth Meek

Meek is Mrs. Hansen's youngest child. Meek and Mrs. Hansen resided together from Meek's birth until Meek turned eighteen years old and went to college. Even after leaving home, Meek "continued to remain close with her mother and father." Meek stated that she and Mrs. Hansen shared "many life experiences," such as caring together for Mrs. Hansen's former husband (Meek's father) and for Ferguson's daughter. Meek describes her relationship with Mrs. Hansen as "close and loving." Meek visited Mrs. Hansen in Cambridge in 2009 and again in 2017, and Mrs. Hansen visited Meek "at least once each year from 2008 through 2013." Meek resides in San Diego, California.

### C.    Patrick Ferguson

Ferguson is Mrs. Hansen's middle child. Ferguson resided in a trailer on the Cassons Neck property with Mr. and Mrs. Hansen from early 2018 until March 15, 2019. Although Mr. Hansen was not Ferguson's father, Ferguson referred to Mr. Hansen as "dad." Ferguson checked on Mr. and Mrs. Hansen regularly and "would often have dinner or go out to dinner with them." Ferguson and Meek have a history of acrimony between them, including Ferguson threatening to use physical violence against Meek.

## II.     Mrs. Hansen's Dementia

Mrs. Hansen began seeing Dr. Jeevan Errabulo,[2] a local primary care physician, in 2010, and Dr. Errabulo first noted Mrs. Hansen's dementia in August 2012. Medical records written by Dr. Errabulo repeatedly refer to Mrs. Hansen's dementia. Specifically, on April 3, 2013, Dr. "Errab[u]l[o] noted that his patient's chief complaint was that she was disoriented . . . . [H]istory [from patient] has been unreliable due to dementia issues." Again in medical records dated December 28, 2017, Dr. Errabulo wrote that Mrs. Hansen "remained confused due to her dementia." Dr. Errabulo later opined that "Mrs. Hansen's mental state declined considerably during the years 2017 through 2018."

## III.    2017–2018

In March 2017, Linton and Meek visited the Hansens' home after they were alerted that their mother was having increased cognitive difficulty. When he arrived, Linton found the house to be in "terrible condition." The home smelled of "ammonia from dog urine along with urine stains on the furniture and carpets." Mrs. Hansen had apparently scorched the microwave from cooking aluminum foil inside of it. "[M]old [was] growing on the ceiling from an improper roof repair." Papers, bills, syringes, and medicine bottles littered the dining room table and kitchen counters. A large sum of money was found in the clothes dryer and at least $1800 "was falling out of" Mrs. Hansen's purse. Mrs. Hansen began to cry when asked why she had so much money, because "she could not tell them about this money."

---

[2] The record contains two spellings of Dr. Errabulo's name. We adopt the spelling used in the Official Transcript of Proceedings of the May 20, 2019 hearing.

In October 2017, Phoebe Westsinger, Mrs. Hansen's niece and goddaughter, visited Mrs. Hansen. During this visit, Mrs. Hansen "appeared disheveled where once [Mrs. Hansen] was meticulous about her appearance in public." Additionally, Mrs. Hansen repeated herself throughout their conversations. Westsinger returned to Cambridge in January 2018 and observed that the Cassons Neck home was "appalling" and in "disarray." During this visit, "Mrs. Hansen had a hard time following her questions and . . . asked the same questions of Wes[t]singer repeatedly."

On or about April 10, 2018, Mr. Hansen called his long-time attorney and friend, Ray Simmons, and asked him "to draw up a Power of Attorney and Health Care Directive" for Mrs. Hansen and told him "that he [Mr. Hansen] was to be Mrs. Hansen's primary AIF and Patrick Ferguson was to be the back-up."[3] Mr. Hansen explained that Mrs. Hansen "required a new Power of Attorney and revocations that related to prior documents because of some sort of financial/family issues she was having with [Meek]." Mr. Hansen did not "mention that his wife had any sort of cognitive issue, disability, or dementia." Then on April 11, 2018, Simmons came to the Hansens' house in order for Mrs. Hansen to execute a new Power of Attorney and Health Care Directive and revoke the 2008 documents. According to Mr. Hansen, Mrs. Hansen "had the capacity to execute the new POA and revocations." Again, he failed to mention "that his wife was diagnosed with dementia or that she had any cognitive impairment at all." Simmons reviewed the new Power of Attorney and Health Care Directive with Mrs. Hansen for forty minutes, and Simmons

---

[3] Simmons later stated that Mr. Hansen came into his office, instead of calling.

6

found Mrs. Hansen to be "in contact with reality in [his] opinion."  Mrs. Hansen then executed the new Power of Attorney and Health Care Directive ("the 2018 documents") and revoked the 2008 documents.

Later in July or August 2018, Linton visited the Hansens' home again.  He found the house to be in better condition "but still not good."  Linton then had a conversation with Ferguson and told him to fix and clean the house.  Linton returned to the Hansens' home on or around December 13, 2018, and found the home to be in much better condition.  Linton attributed some of this improvement to Marsha Palmer, a caretaker that Mr. Hansen hired to assist Mrs. Hansen.

## IV.    The Power of Attorney Case

Sometime after April 11, 2018, Meek learned that Mrs. Hansen had revoked the 2008 documents and executed the 2018 documents, which appointed Mr. Hansen as AIF and Health Care Agent and Ferguson as the back-up.  On September 14, 2018, Meek filed a Verified Petition for Emergency Relief and Declaratory Judgment in the Circuit Court for Dorchester County, seeking emergency relief under E.T. § 13-709 and requesting that the court determine (1) the validity of the 2008 documents and trust agreement, and (2) the validity of the 2018 Power of Attorney and revocation of the 2008 documents ("the POA case").  After a hearing on January 7 and 10, 2019, the circuit court entered a written Declaratory Judgment and Order on January 14, 2019.  The order determined and declared that (1) "Mrs. Hansen [wa]s not a person in need of emergency services pursuant to Section 13-709 of the Estates and Trusts Article"; (2) the 2018 Power of Attorney and the

7

revocation of the 2008 documents were invalid, because Mrs. Hansen was not mentally competent at that time; and (3) the 2008 documents were valid.

In late January 2019, Meek filed a Motion to Alter or Amend Judgment, in which she "allege[d] that the Court was in error in finding that an 'emergency' did not exist as this term is contemplated in Section 13-709 of the Estates and Trust[s] Article" and that the circuit court's declaration "was insufficient as a matter of law and that a more detailed written opinion concerning the Court's finding should be prepared." In an Opinion and Order dated February 18, 2019, the court granted in part and denied in part Meek's Motion to Alter or Amend Judgment. Regarding its finding that an "emergency" did not exist within the meaning of E.T. § 13-709, the trial court stated that "[b]y the time of the hearing, the conditions that could have constituted an 'emergency' . . . abated." The court credited the testimonies of Linton, Simmons, Dr. Errabulo, Ferguson, and other witnesses, that "the conditions of the Hansen home [had] vastly improved" by the time of the January 2019 hearing. Notably, because Dr. Errabulo testified that "nothing [in the home] was unsafe or dangerous," the court held that it did not have the "authority to order emergency services as contemplated in [E.T.] § 13-709(b)." The court then granted the portion of Meek's motion requesting a more detailed written opinion. In the Opinion and Order the court wrote a twenty-four page opinion setting forth its findings of fact and conclusions of law in the POA case.

## V. The Guardianship Case

On January 23, 2019, while the POA case was still pending, Linton filed a Petition for the Appointment of Guardian of the Person and Property of Lois Ann Hansen, an

Alleged Disabled Person ("the guardianship case"). Linton supported the guardianship petition with the following relevant allegations:

> 19. That notwithstanding the presence of a dedicated and loving care provider who arrives each day at 9:00 a.m. and leaves at 8:00 p.m., at the [Hansens]' residence, seven days a week, to assist [Mrs. Hansen] with all of her needs, the presence of [Mr. Hansen] and [Ferguson], and the comfort of her surroundings, the said [ ] Meek insists that their mother be removed from her residence and institutionalized.

> 20. That [Linton] has at all times since his mother's relocation to Maryland remained in close contact with her, calling the house where she lives two to three times per week, speaking with either his mother, her husband, Adrien, or his brother [ ] Ferguson; [Linton] visits [his] mother every other month.

> 21. That . . . [Meek's] contact with [Mrs. Hansen] has been remarkably limited during the last ten years; she has visited her mother on but two occasions during this period of time, and on those occasions the visits were incidental to other purposes.

> 22. That despite [Linton's] repeated attempts and pleas to convince his sister to allow their mother to remain at home, . . . Meek persists in pursuing an objective which [Linton], [Mr. Hansen], and [Ferguson], believe is contrary to their mother's wishes and best interest . . . .

> 23. That [Mrs. Hansen] has always made it clear to her children, her husband[,] and primary care physician that her principal desire is to remain at home if at all possible.

On January 28, 2019, the circuit court appointed counsel for Mrs. Hansen.

The circuit court held a hearing on the guardianship case on March 15 and 20, 2019. On March 20, 2019, the court completed the taking of evidence but did not have time for the parties to make their respective closing arguments. The court requested, and counsel agreed, that closing argument be submitted in writing.

9

## VI.    The Trial Court's Opinion in the Guardianship Case

On May 20, 2019, the trial court held a hearing during which it rendered an oral opinion in the guardianship case. The court set forth its findings of fact and conclusions of law in a thorough and well-reasoned opinion spanning twenty-two pages of the transcript. Relevant portions of the court's opinion are as follows:

> So here are my findings of facts. Lois [A]. Hansen is 81 years of age. She resides with her husband, Adrien Hansen, at [ ] Cassons Neck Road, Cambridge, Maryland.
>
> Mr. and Mrs. Hansen were married on June 4, 2010, and have lived together as husband and wife happily without interruption since the date of their ceremony. . . .
>
> \*\*\*
>
> Thomas Warren Linton, a petitioner in this case, is 65 years of age and is Mrs. Hansen's oldest son[;] he resides in New Bern, North Carolina. He has lived in New Bern for eleven years, he's married with two sons and two daughters, has grandchildren and a great grandchild. He has served in the Marine Corps[;] he joined the armed services when he was 18 and served for 23 years until he retired as a Master Sergeant and was honorably discharged. Now he runs a small landscaping business.
>
> \*\*\*
>
> The Court found [Linton's] testimony credible that he quote "loves his mom to death" end quote. Mrs. Hansen spoiled him when he was with her. They also enjoy a jovial, joking relationship where they would tease each other about their personality traits.
>
> \*\*\*
>
> During trial [ ] Linton's motives were called into question by [ ] Meek, who was shown to have not read the Court's opinion in [the POA case], and his litigation expenses in this case were advanced by Mr. Hansen. While these facts definitely caused the Court to carefully evaluate [ ] Linton and his motives, the Court finds that his testimony, taken as a whole, shows that his motives are relatively altruistic.

10

**[Linton] does love his mother and his sister, [ ] Meek. Whether he is motivated by financial gain could be questioned, this could be a possible motive for all parties involved in this case**. It is not likely, based upon the totality of the evidence educed [sic] in this matter, **assuming arguendo that financial gain motivates [ ] Linton or any other party to this matter, any such motive and attendant negative effect upon Mrs. Hansen can be ameliorated by the Court appointing a [neutral] party to act as guardian of the property.**

[ ] Linton certainly has made mistakes, as this case unfolded . . . . The Court, however, finds that [ ] Linton is generally of good character and is motivated by a desire to care for his mom and see to it that her overall dignity is preserved and her best interest served.

***

Patrick Ferguson is 60 years of age, is single and has resided in the trailer on the Cassons Neck property with his mother and Mr. Hansen from early 2018 until March 15, 2019. Based upon the totality of the evidence that this Court received in [the POA case] and during the instant case, the Court is very concerned about [Ferguson]. His actions in the case exacerbated the acrimony among all parties.

***

[ ] Meek is Mrs. Hansen's daughter, she is 58 years of age and resides in San Diego, California. [ ] Meek enjoyed a close and loving relationship with her mother. She resided with her mother from birth until the age of 18, after which she attended college.

During her life she worked for her family's floral business and during her adulthood she remained close with her mother. The closeness between [ ] Meek and her mother was certainly confirmed by the testimony of . . . Phoebe Westsinger. She shared many experiences with her mother through which they forged a very close bond.

I will note that I took a lot, I got a lot out of . . . Wes[t]singer's testimony and found her to be very credible.

Among these experiences was caring for Mrs. Hansen's former husband and [ ] Meek's father after he was diagnosed with cancer. She also

11

aided in petitioning for guardianship of the daughter of [ ] Ferguson and helped raise [ ] Ferguson's daughter.

***

Just prior to moving to Maryland to live with Mr. Hansen, Mrs. Hansen executed a Power of Attorney, the Health Care Directive, and the Lois A. Davis Intervivos Revo[c]able Trust on June 12, 2008. In the Health Care Directive [ ] Meek was designated as Mrs. Hansen's health care agent. The alternate agent was not one of Mrs. Hansen's other children, either [Ferguson] or [Linton], but was her close friend Margaret N. Calder, who has since departed this life. . . .

***

Mrs. Hansen also appointed [ ] Meek as her primary attorney[-]in[-]fact, with the power to perform all things that she herself could do in the transaction of any business on such terms and in such manner as said attorney[-]in[-]fact may deem appropriate.

***

**[ ] Meek honestly believes that her mother is better, that it's better for her mother if she's transported from the home on Cassons Neck Road where she has lived since 2008 with her husband Mr. Hansen and is placed in a nursing home.** She argues that it is not in the best interest of Mrs. Hansen to remain in the Cassons Neck home because she's not receiving care from a skilled provider or care that is tailored for a person suffering from dementia. She mentioned that in the evaluation for a Court, Dr. Errabulo reaffirmed that Mrs. Hansen requires 24 hour care and that she is not receiving such care.

The Court notes, however, that Dr. Errabulo verified those statements during a hearing in this instant case, explaining that the care he recommended in his report and affidavit "could be beneficial" but that she was currently getting "quite appropriate care".

He further testified that 24/7 care would not be needed in the middle of the night. **The Court took the totality of his testimony to mean that he was satisfied that Mrs. [Hansen] was being adequately cared for in her home, that she was comfortable and happy. Indeed, the Court gleaned from his testimony that it would be in Mrs. Hansen's best interest to remain in the home and that she would likely receive little to no benefit**

12

**from physical therapy and may be harmed by a sudden change in her surroundings and her caregivers. His exact words, that under such circumstances "the majority of the time it is not good," meaning the change.**

The Court notes that [ ] Meek is motivated by pure love and devotion to her mom. She is truly operating under this mode, based upon the Court's evaluation of the totality of evidence in this case. . . .

The Court also notes the following facts[,] which are relevant to the Court's determination in this matter. [ ] **Meek did not visit with her mother at the Cassons Neck home from 2008 through 2017 with the exception of a family reunion hosted by [Mr.] Hansen just prior to her mother's marriage to Mr. Hansen. According to the testimony it was [ ] Linton who actually alerted [ ] Meek to the exacerbation of Mrs. Hansen's health conditions in 2017 when the dementia was becoming the most salient feature of Mrs. Hansen's health.** [ ] Linton contacted both of his siblings for the purpose of getting together to discuss what they could do to assist Mr. Hansen in taking care of their mother. [ ] Linton testified that he contacted [ ] Meek so that she could come to understand and appreciate her mother's condition as it was dramatically worsening, in his opinion.

Each of the siblings arrived at their mother's and Mr. Hansen's home. [ ] Linton never heard back from [ ] Meek. [ ] Meek just started acting independently of her siblings without communicating with them, presumably she was operating under the authority she believed was granted to her by virtue of the above-referenced Power of Attorney and Health Care Directives. [ ] Linton agreed during his testimony that they had a meeting at the house.

[ ] Linton has proven, in my opinion, by clear and convincing evidence that Mrs. Hansen suffers from dementia, which she has suffered from for the past several years. Indeed the Court notes that by the two physicians' certificates[,] which I take note of and incorporate herein, filed in this case, attest to the fact that Mrs. Hansen has advanced dementia and does not have the mental capacity to understand or consent to the appointment of a guardian. Notably both physicians further attested that Mrs. Hansen does not require institutionalized care at this time.

**The Court takes notice of the testimony of Dr. Errabulo[,] which the Court detailed on pages nine through eleven of [its] opinion in [the POA case]. Dr. Errabulo clarified that Mrs. Hansen has been his patient since 2010. She suffers from advanced dementia that is lifelong and**

**irreversible. It came across from the substance of his testimony and his manner of testifying that he truly cared for his patient and wants what is in her best interest.** He made several home visits to check on her status during the pendency of this case. He has caused home hospice care to assist in Mrs. Hansen's care. He also testified that he speaks to home health providers regularly. **He testified that his patient wanted at all times to stay home. That she never wanted to be placed in a box – that she never wanted to be placed in a box, which in context of all the evidence that the Court received in this case meant that she did not want to be placed in a nursing home.**

**As Dr. Errabulo described, at home Mrs. Hansen is pleasantly demented. He also stated that in his great experience with Cambridge, Maryland's greying population, such patients do not deal well with change. He explained that under such circumstances when there is great change in the demented person's environs, the majority of the time the outcome will not be good. He made it clear that if she is kept comfortable and all can visit in her home, that would be what is in her best interest.**

***

[Dr.] Errabulo noted that the home health and hospice provides adequate stimulation for a person in Mrs. Hansen's condition. He also noted that physical therapy at this point in Mrs. Hansen's treatment would result in very minimal benefit. He emphasized that Mrs. Hansen was getting quite appropriate care, although he did admit that skilled nursing care could be beneficial, it would not be needed around the clock. For instance, he stated that a skilled nurse would not be needed in the middle of the night.

The Court also heard from [ ] Marsha Palmer. [ ] Palmer was paid by Mr. Hansen to provide care for Mrs. Hansen in their home. She testified in detail as to her routine. She arrives at the Hansen home at 8 a.m. each day, seven days a week, and stays until Mrs. Hansen falls asleep, usually about 9 p.m. The Court was very impressed with the attention and physical contact that [ ] Palmer has with her client. A typical day consists of the following: she lays in bed with Mrs. Hansen until Mrs. Hansen wants to get up. She attends to her hair and hygiene. She takes Mrs. Hansen into the living room, decoy room, and sometimes into the kitchen in her wheelchair while she makes breakfast, which often consists of scrambled eggs topped with strawberry preserves. At lunch she prepares Mrs. Hansen's lunch. At dinner she sits with Mr. and Mrs. Hansen at the dinner table.

14

[ ] Palmer noted the beautiful waterfront view that Mrs. Hansen gets to enjoy while she resides in her home.  Notably the Court also received testimony from Mr. Hansen, . . . and others that Mr. and Mrs. Hansen love each other and enjoy each other[']s company, touch and affection dearly.

*** 

The weight of all of this evidence goes not towards an argument that [ ] Palmer should not be caring for Mrs. Hansen[;] indeed it is quite the contrary.  She has convinced me that she is caring and honest, one of the most caring human beings that Mrs. Hansen has involved in her life.

*** 

The Court also received testimony from Wendy Shertenlieb[;] she was a registered nurse who had been providing care for Mrs. Hansen for six months.  She testified that she sees Mrs. Hansen two weeks at a time, anywhere between forty-five minutes and two hours is what she told me.  She assesses Mrs. Hansen's surroundings, makes mental and skin assessments to ensure that Mrs. Hansen is well cared for.  Notably she testified that Mrs. Hansen has no sores, those are the bedsore types, and exhibits no observable conditions that caused Coastal [H]ospice any concern.

She further testified that a music therapist comes in once every other week and plays piano for Mrs. Hansen.  [ ] Shertenlieb also testified as other witnesses in [the POA case] on the importance of Boo Boo, the chocolate lab.  [ ] Shertenlieb testified that Boo Boo comes and sits with her[;] she exclaimed "she loves that dog".  And I will say this, that Boo Boo has come – Boo Boo's presence has come with a cost, too, and that's always very difficult.  The Court, as others in this courtroom are probably dog owners, when old labs get old and they tend to urinate on the carpet, the smell has a very heavy ammonia smell to it.  It can be very frustrating.  But in this circumstance, it seems like parties have taken care of that issue with maximum extent that they can, they probably can't alleviate all instances of the dog urinating, however, whatever detriment is derived from Boo Boo's presence there's a greater effect upon Mrs. Hansen's best interest that she have the companionship of Boo Boo; it's so important to individuals in her capacity. . . .

Supporting [ ] Shertenlieb's testimony was Kylie Bender, she is a Social Worker assigned to Mrs. Hansen through Coastal [H]ospice.  She testified that she meets with Mrs. Hansen every other week to determine if

15

she needs to make any referrals to outside resources. She testified that Mrs. Hansen is extremely well taken care of.

**The Court notes that after all the testimony was educed [sic] from Dr. Errabulo, [ ] Palmer, [ ] Shertenlieb and [ ] Bender about Mrs. Hansen's state of mind, her wishes that she not be placed in a box, her wishes that she not be separated from her husband, [Mr.] Hansen, and the great care she is receiving at home, [ ] Meek still makes clear that her intention was to place her mother in HeartFields Nursing Facility.**

Kelly Johnson, Executive Director at HeartFields, testified concerning the care that Mrs. Hansen would receive at HeartFields. She testified that Mrs. Hansen would reside in their neighborhood unit, which the Court did not believe to be as pleasant as the Cassons Neck home, based upon my assessment of all of the testimony. At the Cassons Neck Home she has a waterfront view, she has the care of [ ] Palmer. It was clear to the Court that the nurse at HeartFields would provide nursing services to Mrs. Hansen every day, but that she likely had other patients to look after.

[ ] Meek is convinced that her mother would be more stimulated at HeartFields because of their specialized experience and the programs they provide. Viewing this testimony in light of Dr. Errab[u]l[o]'s testimony, the Court is not convinced that this would be the case. Indeed, [Dr.] Errabulo, a medical professional who has had a long-standing doctor patient relationship with this particular patient, seemed to disagree and warned that normally such a change for a patient such as Mrs. Hansen is detrimental.

**The Court notes that right now with the care that Mrs. Hansen is receiving at home and all the support from caregivers, family and medical professionals it is in her best interest to remain at home and not be placed in a facility. Such has been proven by clear and convincing evidence during this hearing.** This may change at some point where the potential downsides of leaving what is beautiful, comfortable[,] and familiar are outweighed by the benefits provided by a place like HeartFields, but the overwhelming weight and impact of the evidence right now proved to the Court that such is not the case today.

The applicable priorities in this case for determining the guardian of a person and property are in the following order: a health care agent appointed by the disabled person, spouse, parents, then children, and finally any other person considered appropriate by the Court. For good cause shown the Court may pass over a person with priority and appoint a person with less or no priority. The Court found in [the POA case] that Mrs. Hansen

16

appointed [ ] Meek to be her attorney[-]in[-]fact and health care agent in the June 12, 2008, Power of Attorney and Health Care Directive that she signed before she left California, before she married Adrien Hansen and spent years loving him and building a life and home with him.

**Under the Estates and Trusts Article ordinarily the enforcement or permitted operation of documents that Mrs. Hansen executed on June 12, 2008, would represent the least restrict[ive] means available as Mrs. Hansen appointed [ ] Meek to be her attorney[-]in[-]fact and her health care agent when she was of sound mind. The Court finds, however, that [ ] Linton has proven by clear and convincing evidence that there exists good cause to avoid the priority status granted to her pursuant to the Power of Attorney and Health Care Directive. The Court is convinced that [ ] Meek loves her mother[,] but she is simply not contemplating the life her mother chose to build with Mr. Hansen, the love she has for her husband, her dog, her home, her water view, and the team of professionals and caregivers who have been assembled to care for her.**

**Also, the Court cannot discount the testimony of Dr. Errabulo, her long-time personal physician, who by the way seems to be more dedicated, knowledgeable[,] and concerned about his patient than most. She did not want to be taken from her home, from [Mr.] Hansen, regardless of how [ ] Meek feels about him. Her dog, her view and not being placed in a nursing home, those are values above all others that should be considered to the maximum extent practicable as long as it does not significantly risk Mrs. Hansen's health and well-being.**

**The weight of the evidence is that she is well cared for and that her health and well-being may actually be negatively impacted if she is ripped out of what is familiar and placed in HeartFields. If the Court does not grant this guardianship to another, Mrs. Hansen's placement in HeartFields will be certain, swift[,] and sudden.**

**By clear and convincing evidence it would not be in Mrs. Hansen's best interest to have a guardian who is not factoring in her wishes as the [2008 Advance Health Care Directive] require[s], and what is at this point subjectively not in her best interest.**

Certainly the Court has concerns about the prior condition of the Cassons Neck property detailed in [the POA case], but so much has changed. So many caregivers are coming into the home to monitor conditions and care. Should conditions change the Court, upon petition, could change its orders.

. . . . Thus the Court appoints [ ] Linton as guardian of [Mrs. Hansen]'s person. In making decisions for Mrs. Hansen, the Court is explicitly making it a condition that he consults with [ ] Meek about their mother's care. He, however, makes the final decision and if [ ] Meek refuses to speak or cooperate with [ ] Linton to discuss Mrs. Hansen's care, [ ] Linton, of course, has full authority to make decisions on behalf of his mother.

***

[ ] **Linton has also shown by clear and convincing evidence good cause for the Court to appoint a neutral guardian of the property of [Mrs.] Hansen. [ ] Meek's appointment as guardian of the property, considering all the evidence, is just unworkable and not in the best interest of [Mrs.] Hansen.**

**All the parties' motives in this case have been clouded with the potential for financial gain and interest that they may have in Mrs. Hansen's assets. The Court orders could be obstructed by the person who holds the pursestrings in this case. Suspicions over the motivation of Mr. Hansen and [ ] Meek has actually exacerbated the acrimony[,] which has affected the family and Mrs. Hansen. Mrs. Hansen deserves to have a [neutral] third party who is unemotional, detached[,] and who will truly act in her best interest. Also a [neutral] guardian is needed to unravel the financial transactions executed by her daughter and by [Mr.] Hansen. A [neutral] guardian will determine what assets Mrs. Hansen should have in her name and how much is needed to truly provide for her care and well-being.**

**The Court appoints Barrett King, Esquire, if you should accept this appointment, as guardian of the property of Mrs. [ ] Hansen.**

(Emphasis added).

On June 3, 2019, the circuit court issued an Order in accordance with the above opinion. On June 17, 2019, Meek filed a Notice of Appeal. We will supply additional facts as necessary to the resolution of this appeal.

18

**STANDARD OF REVIEW**

We recently determined the appropriate standard of review in adult guardianship cases. *See In the Matter of Meddings*, 244 Md. App. 204, 220 (2019). After a thorough review of the case law, Judge E. Gregory Wells, writing for this Court, stated:

> We conclude that in reviewing whether a circuit court properly decided to appoint a guardian for an adult, we adopt a tri-partite and interrelated standard of review. **Factual findings will be reviewed for clear error**, while purely legal determinations will be reviewed without deference, unless the error be harmless. **As to the ultimate conclusion of whether an adult guardianship is appropriate, the circuit court's decision will not be disturbed unless there has been a clear abuse of discretion.**

*Id.* (emphasis added) (citations omitted).

**DISCUSSION**

**I.    No Less Restrictive Form of Intervention**

Under E.T. § 13-705(b):

> (b) A **guardian of the person** shall be appointed if the court determines from clear and convincing evidence that:
>
>> (1) A person lacks sufficient understanding or capacity to make or communicate responsible personal decisions, including provisions for health care, food, clothing, or shelter, because of any mental disability, disease, habitual drunkenness, or addiction to drugs; and
>>
>> **(2) No less restrictive form of intervention is available that is consistent with the person's welfare and safety.**

(Emphasis added).

Meek concedes that "[i]t is undisputed [that] Mrs. Hansen lacked sufficient understanding or capacity to make or communicate responsible decisions concerning her person." Meek contends, however, that "[t]he appointment of a guardian of the person and

19

property of Mrs. Hansen was not the least restrictive means available." Meek argues that by executing the 2008 documents, "Mrs. Hansen expressly selected Meek to make decisions on [Mrs. Hansen's] behalf once [Mrs. Hansen] was no longer capable of doing so." According to Meek, "[t]here is no reason to appoint a guardian when Meek is fully willing and capable of acting as Mrs. Hansen's health care agent and attorney-in-fact." Meek concludes that "[t]he least restrictive form of relief available mandated that Meek be authorized to continue to act under the [2008 documents]."

Counsel for Mrs. Hansen responds that "Meek ha[s] proven [that] she is unwilling or incapable of acting in Mrs. Hansen's best interests in both her capacity as Health Care Agent and Attorney-In-Fact." Therefore, according to Mrs. Hansen's counsel, "the trial court had no choice but to appoint a Guardian of the Person and Guardian of [the] Property to protect Mrs. Hansen."

Likewise, Linton argues:

> On its face, Meek's appointment as Health Care Agent represented a less restrictive form of intervention contemplated by the statute, . . . In reality, it did nothing of the kind. In action, the exercise of her authority has proved disastrous for the family and [ ] properly gave the trial court pause.

Linton also pointed to (1) the trial court's finding, based upon clear and convincing evidence, that it was in Mrs. Hansen's best interest to remain at home and not be placed in a facility, and (2) the court's observation that, notwithstanding the testimony of four witnesses to the contrary, "Meek still makes clear her intention to place her mother [in the] Heart[F]ields Nursing Facility."

20

In *Meddings*, we addressed the issue of whether under E.T. § 13-705(b)(2) a no less restrictive form of intervention was available that was consistent with the alleged disabled person's welfare and safety. 244 Md. App. at 220–21. Applying the aforementioned standard of review, we determined that such issue was one of fact, and thus we reviewed the trial court's rulings for clear error. *Id.* at 226–29, 233.

In *Meddings*, Clifton T. Perkins Hospital Center ("Perkins") petitioned the circuit court to appoint a guardian for one of its patients, Robert Meddings, who was diagnosed with schizophrenia and atrial fibrillation. *Id.* at 207. Perkins sought the appointment of a guardian because (1) Meddings refused to take his medication and the hospital was forced to convene a Clinical Review Panel ("CRP") every 90 days to review and forcibly administer Meddings's psychotropic medications; (2) medication to treat Meddings's atrial fibrillation was not subject to the CRP; thus the doctors could not forcibly administer medications to treat that condition; and (3) Meddings did not have an advance medical directive. *Id.* at 209. After a bench trial on Perkins's petition, the court found that Meddings was a disabled person and appointed Meddings's brother as guardian of his person. *Id.* at 213.

Meddings appealed to this Court and argued that the trial court erred in finding that a less restrictive form of intervention was not available, because Perkins had three alternatives available to it: "(1) the CRP, (2) a surrogate decision maker, and (3) an advance directive." *Id.* at 220. Conversely, Perkins contended that "the issue is[ not] whether a less restrictive form of intervention exists, rather, the issue is 'whether a less restrictive alternative was available *and consistent with Mr. Meddings' own welfare and safety*

21

*needs.'" Id.* at 223 (emphasis added). Perkins claimed "that the CRP, a surrogate decision-maker, and use of an advance directive are not 'practically available' alternatives in Meddings' case because they are inconsistent with his health and welfare." *Id.* at 224–25. We agreed with Perkins and held that the trial court did not commit clear error in its finding that the CRP, a surrogate decisionmaker, and the use of an advance directive were not available as less restrictive forms of intervention consistent with Meddings's welfare and safety. *Id.* at 227–29, 233. Accordingly, we concluded that the trial court did not abuse its discretion in its "decision to appoint a guardian for Meddings, finding that it was the least restrictive alternative for him." *Id.* at 233.

Here, like Meddings, Meek seeks to limit our inquiry to simply finding that a less restrictive form of intervention to a guardianship is available. Meek claims that, because she is willing and capable to act as Mrs. Hansen's Health Care Agent and attorney-in-fact under the 2008 documents, there "is no reason to appoint a guardian." Meek, however, overlooks the language of E.T. § 13-705(b)(2) that a less restrictive form of intervention must be "consistent with the person's welfare and safety." In other words, the availability of a form of intervention less restrictive than a guardianship is insufficient alone to defeat a petition for guardianship. The form of intervention also must be "consistent with the person's welfare and safety." *Id.* at 224.

The trial court specifically found, by clear and convincing evidence, that it was in Mrs. Hansen's best interest to remain at home and not be placed in a facility. In making the finding that it was in Mrs. Hansen's best interest to remain at home, the court relied on Dr. Errabulo's professional opinion that Mrs. Hansen was receiving "quite appropriate

22

care" at home.  The court also pointed to the testimony of Palmer, who was Mrs. Hansen's in-home caretaker.  The court emphasized Palmer's role in Mrs. Hansen's care by highlighting Palmer's routine, which included arriving at the Cassons Neck home "at 8 a.m. each day, seven days a week, and stay[ing] until M[r]s. Hansen falls asleep, usually about 9 p.m."  Each day, Palmer would lie in bed with Mrs. Hansen until Mrs. Hansen was ready to get up, attended to Mrs. Hansen's hair and hygiene, made Mrs. Hansen's breakfast and lunch, and sat with Mr. and Mrs. Hansen at the dinner table.  The court concluded that Palmer "convinced me that she is caring and honest, one of the most caring human beings that Mrs. Hansen has involved in her life."

In addition, the trial court noted that Mrs. Hansen benefited from regular visits by Shertenlieb, a registered nurse, who testified that "Mrs. Hansen has no sores, those are bedsore types, and exhibits no observable conditions that caused Coastal [H]ospice any concern."  Shertenlieb also testified to the every other week visits by the music therapist, who played the piano for Mrs. Hansen, and to the importance to Mrs. Hansen of the companionship of her chocolate lab, Boo Boo.

The trial court next cited to the testimony of Bender, a social worker assigned to Mrs. Hansen by Coastal Hospice.  Bender testified that she met with Mrs. Hansen every other week and that Mrs. Hansen was "extremely well taken care of."  In light of the testimony of Dr. Errabulo, Palmer, Shertenlieb, and Bender about "the great care [Mrs. Hansen] [wa]s receiving at home," the court concluded, by clear and convincing evidence, that it was in Mrs. Hansen's best interest to remain at home.

23

As stated above, the trial court also found that it was in Mrs. Hansen's best interest "not [to] be placed in a facility." The court again relied heavily on the testimony of Dr. Errabulo. In its opinion, the court noted Dr. Errabulo's testimony about the placement of Mrs. Hansen in a nursing home: (1) Mrs. Hansen "may be harmed by a sudden change in her surroundings and her caregivers"; (2) "in his great experience with Cambridge, Maryland's greying population, such patients do not deal well with change. He explained that under such circumstances when there is a great change in the demented person's environs, the majority of the time the outcome will not be good"; and (3) "normally such change for a patient such as Mrs. Hansen is detrimental." The court concluded that "[t]he weight of the evidence is that [Mrs. Hansen] is well cared for and that her health and well-being may actually be negatively impacted if she is ripped out of what is familiar and placed in HeartFields."

The trial court also found that, despite the evidence that it was in Mrs. Hansen's welfare and safety to remain at home and not be placed in a facility, Meek remained adamant that Mrs. Hansen should be placed in a facility for long-term care. At the end of Linton's case-in-chief, Meek was called as a witness and the following questioning occurred:

> Q. For the record were you present at the proceedings on Friday, March 15, before this Court in this matter?
>
> A. I was.
>
> ***
>
> Q. And you heard the testimony of Dr. Errab[u]l[o]?

24

A.      I did.

Q.      Testimony of [ ] Shertenlieb?

A.      I did.

Q.      [ ] Bender?

A.      I did.

Q.      [ ] Linton?

A.      I heard them all, yes.

Q.      After having heard that testimony is it still your position that your mother should be moved to a facility for long term care?

*** 

Q.      So [t]he answer to the question is, yes, you do believe that—

A.      I believe that my mother can get better care.

Q.      And in your capacity if you are – if after this proceeding you are the Power of Attorney, you would move her to HeartFields?

A.      I am currently the Power of Attorney, and, yes, I would like to have her –

Q.      No, after this proceeding if you're still the Power of Attorney you would move her to Heart[F]ields?

A.      That would be my choice.

In sum, it is clear to this Court that the trial court had ample evidence before it to find, by clear and convincing evidence, that Mrs. Hansen was "well cared for" at home by a team of professional health care providers and family members and that "her health and well-being may actually be negatively impacted" if she was moved from her home to a long-term care facility.  The evidence also supports the trial court's finding that Meek

25

intended to place Mrs. Hansen in a long-term care facility if a guardianship was not granted and Meek was permitted to act as Mrs. Hansen's Health Care Agent under the 2008 Advance Health Care Directive. Therefore, we hold that the trial court did not err when it found that allowing Meek to act as Mrs. Hansen's Health Care Agent under the 2008 Advance Health Care Directive was not a less restrictive form of intervention that was consistent with Mrs. Hansen's welfare and safety. *See* E.T. § 13-705(b)(2).

**II.      Passing Over Meek's Statutory Priority and Appointing Linton as Guardian of Mrs. Hansen's Person**

Priorities for the appointment of the guardian of the person are laid out in E.T. § 13-707, which states:

(a) **Persons are entitled to appointment as guardian of the person according to the following priorities:**

(1) **A person, agency, or corporation nominated by the disabled person if the disabled person was 16 years old or older when the disabled person signed the designation and, in the opinion of the court, the disabled person had sufficient mental capacity to make an intelligent choice at the time the disabled person executed the designation;**

**(2) A health care agent appointed by the disabled person in accordance with Title 5, Subtitle 6 of the Health--General Article;**

(3) The disabled person's spouse;

(4) The disabled person's parents;

(5) A person, agency, or corporation nominated by the will of a deceased parent;

**(6) The disabled person's children;**

(7) Adult persons who would be the disabled person's heirs if the disabled person were dead;

26

(8) A person, agency, or corporation nominated by a person caring for the disabled person;

(9) Any other person, agency, or corporation considered appropriate by the court; . . .

\*\*\*

(c)(1)(i) Among persons with equal priority the court shall select the one best qualified of those willing to serve.

**(ii) For good cause, the court may pass over a person with priority and appoint a person with a lower priority.**

(Emphasis added).

In the instant case, it is undisputed that Meek enjoyed a higher priority than Linton in the selection of the guardian of Mrs. Hansen's person under E.T. § 13-707(a). Mrs. Hansen nominated Meek as the "conservator of my person" and appointed Meek as her Health Care Agent under the 2008 Advance Health Care Directive, and thus Meek had priority under E.T. § 13-707(a)(1) and (a)(2), respectively. Linton had priority under E.T. § 13-707(a)(6) as Mrs. Hansen's child. Nevertheless, the trial court determined that under E.T. § 13-707(c)(1)(ii), there was "good cause" to pass over Meek's statutory priority and appoint Linton as the guardian of Mrs. Hansen's person.

Meek contends that "[g]ood cause was not established to disregard Meek's priority status for appointment as guardian." Meek argues that "[t]he only basis for seeking to have the trial court pass over Meek and appoint [Linton] as guardian of the person and property is the disagreement as to Mrs. Hansen's health care and where she should receive such care." Meek claims that "[n]o evidence was introduced to establish that Meek was

27

unqualified to act as guardian, that she was unwilling to act as guardian of the person and property of Mrs. Hansen[,] or that she had otherwise acted inappropriately with respect to her mother." According to Meek, she wanted Mrs. Hansen to live in an assisted living facility, because Mrs. Hansen was not receiving proper care at home; Meek was worried about Mr. Hansen's motives; and Mr. Hansen was interfering with the communications between Mrs. Hansen and Meek. Meek also contends that "[t]he trial court erred in appointing Linton as guardian of the person due to his inequitable conduct." In particular, Meek asserts that "Linton initiated the guardianship at the request of Mr. Hansen's attorney, Linton's attorney's fees were being paid by Mr. Hansen, Linton failed to review the trial court's decision in the POA [c]ase, and Linton participated in the attempted tape-recording of Meek's visits with her mother."

Counsel for Mrs. Hansen responds that "[t]he trial court made the correct determination by refusing to grant Meek priority status" and appointing Linton as guardian of the person. Counsel for Mrs. Hansen contends that "Meek systematically alienated Mrs. Hansen's family members," and Meek's "acrimonious relationship with her siblings interfered with [Mrs. Hansen's] interests."

Linton responds that, contrary to Meek's argument, "[t]he lower court had multiple reasons for overriding the statutory priority accorded [to] Meek" under the statute. Linton cites as support: (1) "Meek's intractability in seeking to remove her mother from her home . . . was shown to be inconsistent with her mother's wishes, which were well known to Meek"; (2) the trial court found that Dr. Errabulo was more credible than Meek when Dr. Errabulo opined "that transferring Mrs. Hansen from her home was not in her best interest

28

and would more likely than not accelerate her demise"; (3) the separation of Mrs. Hansen from Mr. Hansen proposed by Meek "was entirely inconsistent with . . . the loving relationship between Mrs. Hansen and [Mr. Hansen]"; and (4) Linton was a suitable alternative to Meek. Finally, Linton claims that the actions previously taken and those proposed to be taken by Meek "engendered bitterness, acrimony, suspicion, and a profound lack of trust among the family, including, especially, Mrs. Hansen's husband."

In her reply brief, Meek argues that the trial court erred as a matter of law because it did not recognize that "it retained jurisdiction to decide Mrs. Hansen's place of residence." Thus, according to Meek, "even if the trial court appointed Meek as guardian of the person of Mrs. Hansen, Meek had no ability to transfer Mrs. Hansen's residence unilaterally without court authorization."

### A. Good Cause

In order for a trial court to pass over a person with higher priority under E.T. § 13-707(a) and appoint a person with lower priority under that section as guardian of the person, the trial court must find "good cause." E.T. § 13-707(c)(1)(ii). E.T. § 13-707, however, does not define "good cause." Nor have the Maryland appellate courts explicitly explained what constitutes "good cause" to pass over a person with higher priority under E.T. § 13-707. *See* Angela B. Grau, *Overview of Adult Guardianships*, Md. Trial Rep. 12, 21 (Fall 2018).

The Court of Appeals, however, has defined good cause in other contexts. *See In re Robert G.*, 296 Md. 175 (1983). In *In re Robert G.*, the Court examined whether confidential juvenile court records should be released to prosecutors, who wanted to

consider such records in determining whether to seek the death penalty against a juvenile charged with first-degree murder. *Id.* at 177. In order to determine whether the trial court abused its discretion by releasing the records, the Court had to define good cause, because the pertinent statute stated: "A juvenile court record pertaining to a child is confidential and its contents may not be divulged, by subpoena or otherwise, except by order of the court *upon good cause shown*." *Id.* (quoting Md. Code (1974, 1980 Repl. Vol., 1982 Cum. Supp.), Cts. & Jud. Proc. § 3-828(b) (emphasis added)). Stating that the Court had never defined good cause in the context of releasing juvenile records, the Court noted that Maryland follows the definition of good cause as set forth in Black's Law Dictionary:

> "**Substantial reason, one that affords a legal excuse.** Legally sufficient ground or reason. Phrase 'good cause' depends upon circumstances of individual case, and finding of its existence lies largely in discretion of officer or court to which decision is committed. . . . **'Good cause' is a relative and highly abstract term, and its meaning must be determined not only by verbal context of statute in which term is employed but also by context of action and procedures involved in type of case presented.**"

*Id.* at 179 (quoting Black's Law Dictionary 623 (5th ed. 1979) (emphasis added)). The Court further explained that "'[w]hat will measure up to a showing of good cause in a particular case will depend upon the circumstances of that case.'" *Id.* at 183 (quoting *Kay Const. Co. v. Cty. Council for Montgomery Cty.*, 227 Md. 479, 484–85 (1962) (internal quotation marks omitted)). Quoting from the Pennsylvania case of *Trexler v. Unemployment Compensation Board of Review*, 27 Pa. Cmwlth. 180, 184 (1976), the Court elaborated: "'We must also remember that good cause, being undefined in the Act, is a flexible term and therefore not amenable to general rules or rigid formulas. *Instead, its*

30

*meaning must be deduced from the facts of each case in a manner that is consistent with the Act's fundamental purpose, . . .'" Id.* at 187 (emphasis added); *see also Sanchez v. Unemployment Ins. Appeals Bd.,* 569 P.2d 740, 750 (Cal. 1977) (stating that "the term 'good cause' as used in the statute means an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws") (cleaned up). Based on its in-depth examination of good cause, the Court held that the trial judge did not abuse his discretion by allowing prosecutors to review the juvenile court records to determine whether the State should seek the death penalty. *In re Robert G.*, 296 Md. at 188.

In Maryland, *Mack v. Mack*, 329 Md. 188 (1993), is the only case that has addressed the issue of good cause in the appointment of a person with lower priority over a person with higher priority as guardian of the person under E.T. § 13-707. *Mack* involved an alleged disabled person ("ADP"), who for eight years had been in a persistent vegetative state as a result of brain injuries sustained in a motor vehicle accident. *Id.* at 191–92, 194. The ADP's father and wife cross-petitioned for appointment as guardian of the ADP's person. *Id.* at 194. Notwithstanding the wife's higher priority under E.T. § 13-707(a), the trial court appointed the father as guardian of the person "because it is the father of the [ADP] who will carry into effect the applicable law of Maryland[,] which requires the disabled's life to be continued through the administration of food and water." *Id.* at 196 (internal quotations omitted). The trial court viewed the wife's "intention not to continue artificial nutrition and hydration" as "not consistent with the objectives and directives of Maryland law." *Id.* (internal quotations omitted).

On appeal, the Court of Appeals vacated the appointment of the father as guardian of the person. *Id.* at 206. The Court held:

> Here, there was no finding whether [the wife] could or would fulfill the duties of guardian. There was no finding on [the father's] contention that his geographical proximity to [the ADP] weighted the best interest scale in favor of appointing the father as guardian. Rather, **the circuit court merged the issue of whether sustenance could be withdrawn into the issue of who should be guardian. Because the court concluded that Maryland law required sustenance to be continued, the court concluded that [the wife]'s desire to have sustenance withdrawn constituted good cause to pass over [the wife]'s statutory priority and to appoint [the father]. That assigned reason does not constitute good cause.**

*Id.* at 204 (emphasis added) (footnote omitted). The Court explained further that the lower court treated the wife as "disqualified" to serve as guardian because of her views regarding the withholding of nutrition and hydration. *Id.* at 206. The Court concluded that, contrary to the trial court's opinion, the wife's views were consistent with the statutory requirement, and thus she was "not per se disqualif[ied] from appointment as guardian, although the court may consider [the wife's views] as a factor in an overall determination." *Id.* Finally, the Court made clear in its analysis that "[a] statutory preference in the appointment of a guardian, although seemingly mandatory and absolute, *is always subject to the overriding concern of the best interest of the ward.*" *Id.* at 203 (emphasis added).

From our consideration of the purpose of E.T. § 13-707 and relevant case law, we conclude that "good cause" under E.T. § 13-707(c)(1)(ii) means a substantial reason to find that a person with lower priority under E.T. § 13-707(a) is a better choice than a person with higher priority to act in the best interest of the ward. *See* Black's Law Dictionary at 623; *Mack*, 329 Md. at 203. This definition is a flexible one, and its application will vary

32

with the facts and circumstances of the individual case.[4] *See In re Robert G.*, 296 Md. at 183.

In reviewing the application of the above definition of "good cause" to the facts and circumstances of the instant case, we begin our analysis by looking at the reasons articulated by the trial court to select Linton over Meek as guardian of Mrs. Hansen's person. We determine whether the reasons and any factual findings underlying those reasons are supported by competent evidence and then determine whether the reasons support the conclusion that Linton is the better choice to act in the best interest of Mrs. Hansen. If our answer is in the affirmative, we next review whether the trial court's reasons, either individually or as a whole, can be classified as substantial, and thus constitute "good cause." Such review is made under the abuse of discretion standard. *See In re Robert G.*, 296 Md. at 179–80 (stating that "[w]ithout exception we have applied an abuse of discretion standard in reviewing action by a trial judge" regarding "good cause").

In its opinion, the trial court set forth three reasons why "good cause" existed: (1) Meek failed to consider what Mrs. Hansen valued in her life at that time; (2) Meek's plans for Mrs. Hansen were not consistent with Mrs. Hansen's health and well-being and may have a negative impact on her; and (3) Meek would not "factor in" Mrs. Hansen's wishes while serving as her guardian.

---

[4] Factors that may be considered by the trial court in its determination of "good cause" under E.T. § 13-707 have been identified in two secondary sources. *See* Angela B. Grau, *Overview of Adult Guardianships*, Md. Trial Rep. 12, 21 (Fall 2018); Joan L. O'Sullivan & Andrea I. Saah, *The Guardianship Benchbook: The Practitioner's Guide to Adult Guardianship and Guardianship Alternatives in Maryland*, Apx. A § 12 (2001). We commend these factors to the bench, bar, and litigants.

First, the trial court found:

> The Court is convinced that [ ] Meek loves her mother[,] but she is simply not contemplating the life her mother chose to build with Mr. Hansen, the love she has for her husband, her dog, her home, her water view, and the team of professionals and caregivers who have assembled to care for her.
>
> . . . [T]hose are values above all others that should be considered to the maximum extent practicable as long as it does not significantly risk Mrs. Hansen's health and well-being.

There is ample evidence in the record to support the trial court's findings regarding Mrs. Hansen's love for her husband, her dog, her home, her water view, and all who were caring for her. In our view, nothing could be more central to acting in the best interest of the ward than the recognition and preservation of what the ward values most at that time in his or her life. As the court said, these values "should be considered to the maximum extent practicable."

Second, the trial court found:

> The weight of the evidence is that [Mrs. Hansen] is well cared for and that her health and well-being may actually be negatively impacted if she is ripped out of what is familiar and placed in HeartFields. If the Court does not grant this guardianship to another, Mrs. Hansen's placement in HeartFields will be certain, swift[,] and sudden.

As stated in Section I, *supra*, the evidence supported the trial court's finding that it was in Mrs. Hansen's best interest to remain at home and not be placed in a long-term care facility. Mrs. Hansen was receiving "appropriate care" at home and "may be harmed by a sudden change in her surroundings and her caregivers." Clearly, the best interest of Mrs. Hansen would not involve actions that would place her health and well-being at risk of harm.

Third, the court found:

34

[Mrs. Hansen] did not want to be taken from her home, from [Mr.] Hansen, regardless of how [ ] Meek feels about him. . . .

***

By clear and convincing evidence it would not be in Mrs. Hansen's best interest to have a guardian who is not factoring in her wishes as the [2008 Advance Health Care Directive] requires, . . .

The 2008 Advance Health Care Directive, in which Mrs. Hansen designated Meek as her Health Care Agent, states in relevant part: "My agent shall make health care decisions for me in accordance with this power of attorney for health care, any instructions I give in Part 2 of this form, and my other wishes to the extent known to my agent." Meek became aware of Mrs. Hansen's wishes regarding placement in a long-term care facility when she heard Dr. Errabulo's testimony at trial. Dr. Errabulo testified:

But the one thing is very clear in my mind that she did not want to be put in a box, [were] her words. I clearly remember. I think she meant put in a room, in a geriatric care or dementia care where she'd just lay down there in bed. That's what she meant.

***

That's her way of saying in a nursing home. Notwithstanding such knowledge, Meek testified that it was still her intention to move Mrs. Hansen into a long-term care facility. Therefore, the evidence supports the trial court's finding that, without the appointment of another person as guardian, Meek would have acted in direct contravention of Mrs. Hansen's wishes and of the terms of her appointment as Health Care Agent under the 2008 Advance Health Care Directive.

In light of the above discussion, we conclude that the trial court's reasons and underlying factual findings are based on competent evidence and that the reasons support

35

the conclusion that Linton was the better choice to act in the best interest of Mrs. Hansen. Because those reasons, when taken as a whole, can be classified as substantial, we hold that the trial court did not abuse its discretion by determining that "good cause" existed under E.T. § 13-707 to pass over Meek's statutory priority and appoint Linton as guardian of Mrs. Hansen's person.

### B.    Improper Conduct

Meek argues that the trial court was required to find that Meek acted improperly to find "good cause" to give Linton priority over her.  In support of her argument, Meek cites several out-of-state cases that provide examples of either extreme impropriety or trial court findings not based on competent evidence.  *See, e.g.*, *In re Guardianship of Burrell*, 367 P.3d 318 (Kan. Ct. App. 2016); *In re Penning*, 930 A.2d 144 (D.C. 2007); *In re Mueller*, 872 N.W.2d 906 (Neb. Ct. App. 2015); *In re Conservatorship of T.K.*, 775 N.W.2d 496 (N.D. 2009); *In re Thomas*, 723 N.W.2d 384 (N.D. 2006).   We are not persuaded.  As we said, *supra*,  the determination of "good cause" depends on the facts and circumstances of an individual case.  *See In re Robert G.*, 296 Md. at 183.  In *Mack*, the Court of Appeals expressly rejected the trial court's treatment of the wife's views on withholding artificial nutrition and hydration as "disqualifying" her from appointment as guardian of the person. 329 Md. at 206.  The Court said that the trial court could consider the wife's views "in an overall determination" of "good cause."  *Id.*  Thus we conclude that a determination of "good cause" does not require the trial court to find that the person with higher priority has engaged in improper conduct.  *Accord In re Benson*, 124 S.W.3d 79, 85 (Mo. Ct. App. 2004) (holding that there is no requirement that a trial court find that a family member

seeking to be appointed as guardian was somehow deficient in order for the court to find good cause to pass over that family member).

Likewise, we reject Meek's argument that Linton could not be appointed guardian of Mrs. Hansen's person solely because of his alleged "inequitable conduct." In support of her argument, Meek cites to evidence of several instances of Linton's alleged "inequitable conduct," including the payment of Linton's litigation expenses by Mr. Hansen, the failure of Linton to read the trial court's opinion in the POA case, and Linton's attempt to tape-record Meek's visits with Mrs. Hansen. The trial court considered all of the evidence and "carefully evaluate[d] [ ] Linton and his motives." Although the court acknowledged that Linton "ha[d] made mistakes," it found that "Linton is generally of good character and is motivated by a desire to care for his mom and see to it that her overall dignity is preserved and her best interest served." We see no error in that finding.

### C. The Mack Case

Meek relies heavily on *Mack*, arguing that "[t]he rationale of the Court of Appeals in *Mack* applies to this case." Specifically, Meek contends that "[t]he Court of Appeals in *Mack*, made clear that a mere disagreement regarding the disabled's care does not establish good cause to pass over the statutorily imposed priority." In addition, according to Meek, the trial court erred as a matter of law by "conclud[ing] that Mrs. Hansen could be moved unilaterally by the guardian of the person." We disagree.

In our view, *Mack* is clearly distinguishable from the instant case. In *Mack*, the Court of Appeals held that the circuit court erroneously "merged the issue of whether sustenance could be withdrawn into the issue of who should be guardian." 329 Md. at 204.

37

Specifically, the trial court erred by treating the wife's views on withholding artificial nutrition and hydration as "disqualifying" her from appointment as guardian of the person. *Id.* at 206. Here, by contrast, the trial court did not merge the issue of where Mrs. Hansen should reside into the issue of who should be guardian of the person by disqualifying Meek from appointment because of her plans for Mrs. Hansen's residence. The court considered all of the relevant facts and circumstances, including Mrs. Hansen's values, her health and well-being, and her wishes as to where she should live. The court then set forth three reasons why there was "good cause" to pass over Meek's priority and appoint Linton as guardian of Mrs. Hansen's person. Thus the court properly placed Meek's plans to move Mrs. Hansen into a long-term care facility in the context of its overall "good cause" determination.

Furthermore, unlike in *Mack*, the trial court here did not err as a matter of law by determining that the guardian of Mrs. Hansen's person had the authority to unilaterally move her from her private home into a long-term care facility. E.T. § 13-708 provides in relevant part:

> (a)(1) The court may grant to a guardian of a person only those powers necessary to provide for the demonstrated need of the disabled person.
>
> ***
>
> (b) Subject to subsection (a) of this section, the rights, duties, and powers that the court may order include, but are not limited to:
>
> ***
>
> (2) **The right to custody of the disabled person and to establish the disabled person's place of abode within and without the State,**

38

**provided there is court authorization for any change in the classification of abode**, . . .

(Emphasis added). E.T. § 13-101(c) defines "classification of abode":

(c) "Classification of abode" means one of the following types of abode **licensed or certified by a State agency**:

(1) Related institutions under § 19-114 of the Health – General Article;

(2) Private or public group homes under § 7-601 of the Health – General Article;

(3) CARE homes under Title 6, Subtitle 5, Part II of the Human Services Article;

(4) Adult foster care homes regulated by the Department of Human Resources; or

(5) Senior assisted housing facilities under Title 10 of the Human Services Article.

(Emphasis added).

Notably, E.T. § 13-101(c) only includes entities that are "licensed or certified," which do not include private homes. *The Guardianship Benchbook: The Practitioner's Guide to Adult Guardianship and Guardianship Alternatives in Maryland* explains:

A move from one classification to another, such as from a group home into a nursing home, or from the community into a nursing home, must be approved by the court. **Although the statute does not include private homes as a separate classification, guardians would be well-advised to obtain the court's authorization before moving a disabled person from the community into a more protective setting.**

Joan L. O'Sullivan & Andrea I. Saah, *The Guardianship Benchbook: The Practitioner's Guide to Adult Guardianship and Guardianship Alternatives in Maryland*, Ch. 3, XIII (2001). Therefore, contrary to Meek's argument, the trial court was correct when it stated

that without appointing someone other than Meek as guardian of the person, Mrs. Hansen's

placement in a long-term care facility would be "certain, swift[,] and sudden." We

emphasize, however, that we are not suggesting that guardians move wards from their

private homes into more restrictive facilities without court authorization simply because

E.T. § 13-101(c) does not include a private home as a "classification of abode." We stress

that "[i]n reality the court is the guardian; an individual who is given that title is merely an

agent or arm of that tribunal in carrying out its sacred responsibility." *Kicherer v. Kicherer*,

285 Md. 114, 118 (1979). A guardian who moves a ward from the familiar and comfortable

environment of a private home to a more restrictive facility without court authorization

may not be acting in furtherance of that sacred responsibility.[5]

    In sum, the trial court determined, based on a thorough consideration of all of the

facts and circumstances of the instant case,[6] that "good cause" existed to pass over Meek's

---

[5] Even assuming that Meek was required to obtain court authorization before moving Mrs. Hansen into a long-term care facility, the appointment of Meek as Mrs. Hansen's guardian would not have resolved the underlying issue of this case. Meek testified that, notwithstanding the evidence to the contrary, she still wanted to move Mrs. Hansen from her private home to a long-term care facility. Therefore, it would be counterproductive for the circuit court to appoint Meek as guardian, because Meek would inevitably petition the court to allow her to move Mrs. Hansen into a long-term care facility, which the court would inevitably deny based on its findings that it was in Mrs. Hansen's best interest to remain in her home.

[6] In her brief, Meek also points to facts that the circuit court did not address in its ruling. We decline to address such arguments. Trial judges "are not obliged to spell out in words every thought and step of logic[.]" *Beales v. State*, 329 Md. 263, 273 (1993). Accordingly, a trial court "'need not articulate each item or piece of evidence she or he has considered in reaching a decision. . . . The fact that the court did not catalog each factor and all the evidence which related to each factor does not require reversal.'" *Smith–Myers Corp. v. Sherill*, 209 Md. App. 494, 504 (2013) (quoting *Davidson v. Seneca Crossing Section II Homeowner's Ass'n*, 187 Md. App. 601, 628 (2009)).

40

statutory priority under E.T. § 13-707(a) and appoint Linton as the guardian of Mrs. Hansen's person. The court articulated three reasons that are based on competent evidence, support its conclusion, and when taken as a whole, can be classified as substantial. We hold that the trial court did not abuse its discretion in its "good cause" determination.

### III. Passing Over Meek's Statutory Priority and Appointing a Neutral Third Party as Guardian of Mrs. Hansen's Property

E.T. § 13-207 governs the appointment of a guardian of the property and provides in relevant part:

(a) **Persons are entitled to appointment as guardian for a minor or disabled person according to the following priorities:**

(1) A conservator, committee, guardian of property, or other like fiduciary appointed by any appropriate court of any foreign jurisdiction in which the minor or disabled person resides;

(2) A person or corporation nominated by the minor or disabled person if :

(i) The designation was signed by the minor or disabled person when the minor or disabled person was at least 16 years old; and

(ii) In the opinion of the court, the minor or disabled person had sufficient mental capacity to make an intelligent choice at the time the designation was executed;

(3) The minor or disabled person's spouse;

(4) The minor or disabled person's parents;

(5) A person or corporation nominated by the will of a deceased parent;

(6) **The minor or disabled person's children;**

(7) The persons who would be the minor or disabled person's heirs if the minor or disabled person were dead;

(8) A person or corporation nominated by a person, institution, organization, or public agency that is caring for the minor or disabled person;

(9) A person or corporation nominated by a governmental agency that is paying benefits to the minor or disabled person; and

(10) **Any other person considered appropriate by the court.**

\*\*\*

(c)(1) Among persons with equal priority, the court shall select the one best qualified of those willing to serve.

(2) **For good cause the court may pass over a person with priority and appoint a person with less priority or no priority.**

(Emphasis added).

In the instant case, it is undisputed that Meek enjoyed a higher priority than Barrett King, Esq., in the selection of the guardian of Mrs. Hansen's property under E.T. § 13-207(a). Meek had priority under E.T. § 13-207(a)(6) as Mrs. Hansen's child[7] while King had no priority as a neutral third party, but he was eligible to be appointed as a "person considered appropriate by the court" under E.T. § 13-207(a)(10). The court determined that under E.T. § 13-207(c)(2), there was "good cause" to pass over Meek's statutory priority and appoint King as guardian of Mrs. Hansen's property.

---

[7] Mrs. Hansen did appoint Meek as her attorney-in-fact in the 2008 Power of Attorney. Unlike the Advance Healthcare Directive, however, Mrs. Hansen did not nominate Meek as the guardian of her property in the Power of Attorney. Consequently, Meek's priority is based on her status as Mrs. Hansen's child under E.T. § 13-207(a)(6).

Meek's opening and reply briefs focus on her contention that the trial court erred by appointing Linton as guardian of Mrs. Hansen's person. Meek simply states that "[g]ood cause was not established to disregard Meek's priority status for appointment as guardian in accordance with the Power of Attorney, Health Care Directive[,] and Sections 13-707 and 13-207 of the Estates & Trusts Article." Meek seems to support her argument by citing to a comment in the Uniform Guardianship, Conservatorship and Other Protective Arrangements Act, which has not been adopted in Maryland. Meek quotes the comment to Section 309, which states in pertinent part:

> Consistent with respecting the wishes of the individual and appointing a person who understands the adult's values and preferences, courts should resist the temptation to appoint a professional guardian simply because it is difficult to choose among family members and friends. While a professional guardian avoids the need to select between family members who are feuding or who are otherwise in disagreement, appointment of a professional is likely not to be consistent with the adult's wishes. The extensive literature on surrogate decision-making shows that people typically prefer to have decisions made by close family members.

*Who May be Guardian for Adult; Order of Priority*, Unif. Guardianship, Conservatorship & Other Protective Arr. Act § 309 Comment (citation omitted). Without further argument, Meek concludes: "[T]he trial court's decision appointing . . . King as guardian of the property [should] be reversed, and that [Meek should] be appointed guardian of the . . . property of Mrs. Hansen."

Counsel for Mrs. Hansen contends that King "is best suited to unravel what financial decisions were made by Meek, when they were made, and for what purpose the decisions were made." Counsel for Mrs. Hansen points out that "Mrs. Hansen has substantial assets," including certificates of deposits, the Lois Hansen Intervivos Trust, $5000 of income per

43

month, real property, personal property, and a potential statutory share in Mr. Hansen's estate. Mrs. Hansen's counsel concludes: "King or any attorney acting as a fiduciary for a disabled person makes decisions strictly in the best interest of the disabled person unburdened by the old jealousies and long held resentments that are evident in this family."

Like Meek, Linton focuses his arguments primarily on who should be appointed as the guardian of Mrs. Hansen's person. Linton simply states that "[g]ood cause was shown for passing over Meek and appointing . . . Barrett R. King, Esq., a party unrelated to these proceedings, guardian of the property[.]"

In order for a trial court to pass over a person with higher priority under E.T. § 13-207(a) and appoint a person with lower priority under that section as guardian of the property, the court must find "good cause." E.T. § 13-207(c)(2). E.T. § 13-207, however, does not define "good cause." From a consideration of the purpose of E.T. §§ 13-207 & 13-707 and the relevant case law discussed in Section II, *supra*, we conclude that "good cause" has the same meaning under E.T. § 13-707(c)(1)(ii) and E.T. § 13-207(c)(2). To reiterate, "good cause" means a substantial reason to find that a person with lower priority under E.T. § 13-207(a) is a better choice than a person with higher priority to act in the best interest of the ward. This definition is a flexible one, and its application will vary with the facts and circumstances of the individual case.[8]

---

[8] Factors that may be considered by the trial court in its determination of "good cause" under E.T. § 13-207 have been identified in two secondary sources. *See* O'Sullivan, *supra* note 4, at Apx. A § 13; Grau, *supra* note 4, at 21. We commend these factors to the bench, bar, and litigants.

In its opinion the trial court set forth two reasons why "good cause" existed to pass over Meek's statutory priority and appoint King, a neutral third party, as guardian of Mrs. Hansen's property: Mrs. Hansen deserved and needed a neutral third party who (1) would be detached from any family members with motives for financial gain, and (2) would unravel prior financial transactions involving Mrs. Hansen's assets.[9]

First, the court found:

> All the parties' motives in this case have been clouded with the potential for financial gain and interest that they may have in Mrs. Hansen's assets. The Court orders could be obstructed by the person who holds the pursestrings in this case. Suspicions over the motivation of Mr. Hansen and [ ] Meek has actually exacerbated the acrimony[,] which has affected the family and Mrs. Hansen. Mrs. Hansen deserves to have a [neutral] third party who is unemotional, detached[,] and who will truly act in her best interest.

There is extensive evidence in the record to support the above findings. In 2017, Mr. Hansen had his name added as a joint owner to the certificates of deposit that had been titled in Mrs. Hansen's name alone. Then in 2018, Mr. Hansen retitled those certificates of deposit in his name alone. Moreover, both Meek and Linton have an interest in Mrs. Hansen's assets as heirs of her estate. Given the possible motives of family members for financial gain, it is in Mrs. Hansen's best interest to appoint a neutral third party "who is unemotional, detached[,] and who will truly act in her best interest."

---

[9] Although E.T. § 13-207(a) authorizes a trial court to appoint a corporation as guardian of the property if properly nominated, *see* E.T. § 13-207(a)(2), (5), (8), & (9), there is no provision in the statute for the appointment of a person who is a "professional guardian." *See Who May be Guardian for Adult; Order of Priority*, Unif. Guardianship, Conservatorship & Other Protective Arr. Act § 309 Comment. In the instant case, the trial court considered King "appropriate" as a neutral third party, and thus could appoint him as guardian of Mrs. Hansen's property under E.T. § 13-207(a)(10).

Second, the trial court found:

> Also a [neutral] guardian is needed to unravel the financial transactions executed by [Meek] and by [Mr.] Hansen. A [neutral] guardian will determine what assets Mrs. Hansen should have in her name and how much is needed to truly provide for her care and well-being.

The evidence in the record supports the court's finding that, because of the financial transactions by Meek and Mr. Hansen regarding Mrs. Hansen's assets, there is a need to unravel those transactions. As a result, it is in Mrs. Hansen's best interest to appoint a neutral third party, who will be in the best position to "determine what assets Mrs. Hansen should have in her name."

In light of the above discussion, we conclude that the trial court's reasons and underlying factual findings are based upon competent evidence and that the reasons support the conclusion that King was the better choice to act in the best interest of Mrs. Hansen regarding her property. Because those reasons, when taken as a whole, can be classified as substantial, we hold that the trial court did not abuse its discretion by determining that "good cause" existed under E.T. § 13-207 to pass over Meek's statutory priority and appoint Barrett King, Esq., a neutral third party, as guardian of Mrs. Hansen's property.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

46